IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 10-00320-19-CR-W-DGK |
| MUHAMMAD IBRAHIM ROLLIE, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is defendant's motion to suppress evidence found on his person during his June 1, 2010, arrest, and to suppress all statements made by him that day on the ground that his arrest was without probable cause or even reasonable suspicion, and his subsequent statement was the fruit of that unlawful arrest. I find that defendant's Constitutional rights were not violated and therefore, his motion to suppress should be denied.

### I. BACKGROUND

On June 1, 2010, police arrived at defendant's mother's residence while defendant was in the back yard. Defendant's brother, who was the subject of an arrest warrant, drove his car into the garage door. Defendant heard the crash and ran to the front porch to investigate. He was ordered by police to lie down. He was then handcuffed and searched for weapons. An officer observed a clear plastic bag containing crack cocaine in defendant's front shorts pocket which was hanging open. Defendant was arrested for possession of a controlled substance and later made a statement (which defendant concedes was voluntary and was made after he was advised of his Miranda rights).

On November 18, 2010, an indictment was returned charging defendant with one count of conspiracy to distribute cocaine, crack cocaine, and marijuana, in violation of 21

U.S.C. § 846, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(1).

On June 15, 2011, defendant filed the instant motion to suppress (document number 253). On June 28, 2011, the government filed a response (document number 274) arguing that police had reasonable suspicion to conduct a Terry stop, and the drugs were seized pursuant to the plain view doctrine.

On July 15, 2011, defendant filed a reply[1] on July 15, 2011 (document number 288).

On July 27, 2011, I held a hearing on defendant's motion. The government appeared by Assistant United States Attorney Bruce Rhoades. The defendant was present, represented by Michael Barrera. The following witnesses testified:

1. Officer Aaron Hendershot, Kansas City, Missouri, Police Department
2. Officer Justin Crump, Kansas City, Missouri, Police Department
3. Defendant Muhammad Rollie

In addition, the following exhibits were admitted:

P. Ex. 1      Photo of 308 Spruce

P. Ex. 2      Photo of 308 Spruce

P. Ex. 3      Photo of 308 Spruce

P. Ex. 4      Photo of 308 Spruce

P. Ex. 5      Photo of 308 Spruce

P. Ex. 6      Photo of 308 Spruce

P. Ex. 7      Photo of plastic bag containing crack cocaine

D. Ex. 1      Officer Crump's police report dated June 1, 2010

---

[1]This document was filed before the Stipulations and Orders, which directed that no reply briefs shall be filed without leave of court.

2

  D. Ex. 3  Photo of porch

  D. Ex. 4  Photo of porch

## II. *EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

  1. At approximately 2:30 p.m. on June 1, 2010, members of the Kansas City, Missouri, Police Department's tactical squad were directed by detectives to conduct an arrest of a man driving a blue Durango (Tr. at 7, 51). Officers Crump and Evans, dressed in traditional police tactical uniforms, arrived and observed a blue Durango backed into the driveway at 308 Spruce, and the driver was still sitting in the car (Tr. at 51, 97). Officer Crump was driving his patrol car in which Officer Evans was a passenger (Tr. at 52). Officer Crump pulled into the driveway nose-to-nose with the Durango; the emergency lights were activated on the police car (Tr. at 51-52, 98). As Officer Crump was getting out of his car, the Durango lurched backward hitting the garage door (Tr. at 51-52).

  2. The driveway of 308 Spruce slopes down to a one-car garage (P. Ex. 1, 2). There are retaining walls on both sides of the driveway (P. Ex. 1, 2). At the top of the retaining wall on the right is the front yard (P. Ex. 1, 2). There are six steps that lead up to a porch, which is over the garage (P. Ex. 1, 2, 3, 4). Therefore, the porch is higher than the front yard (P. Ex. 1, 2, 3, 4). The porch is not screened in, but there is a screened-in section at the rear of the porch, and the door into the house is inside that screened-in section (Tr. at 45; P. Ex. 2; D. Ex. 4).

  3. Officers Crump and Evans walked to the elevated yards on either side of the driveway and ordered the driver out of the car (Tr. at 52, 53). A man, later identified as defendant, then walked out of the house and onto a screened-in section of the porch and began

3

yelling things like, "What's going on? What are you doing? That's my brother!" (Tr. at 53). He was being loud and belligerent; he was using curse words (Tr. at 83). Officer Crump walked between the retaining wall on the left side of the driveway and the house next door moving toward the porch, and he ordered defendant several times to come outside (Tr. at 54). Officer Crump was concerned that his attention was split between helping his partner with the driver of the Durango and dealing with defendant who was refusing to follow Officer Crump's directions (Tr. at 54). Officer Crump yelled to defendant to come outside, show his hands, and lie down (Tr. at 54).

    4.    Officers Hendershot and Keil arrived in a Crown Victoria police car (Tr. at 8). The car was unmarked but was equipped with lights and siren (Tr. at 8). They saw that Officers Crump and Evans each had a man at gunpoint; one was on the porch (Tr. at 9, 12).

    5.    When Officer Hendershot arrived, defendant was standing on the porch and Officer Crump was on the retaining wall between the front yard and the driveway below with his gun pointed at defendant (Tr. at 16, 28, 43). Officer Hendershot could hear both defendant and Officer Crump yelling (Tr. at 16, 31, 55). Officer Hendershot's experience is that someone who is willing to be cooperative with police does not yell back at them (Tr. at 42). Defendant's hands were down by his side and his hands were below the screen section so that they could not be seen by the officers (Tr. at 27-28, 31, 75-76). Officer Hendershot joined Officer Crump in yelling orders to defendant to get on the ground (Tr. at 16, 58; P. Ex. 2). Defendant initially refused to follow the verbal commands to show his hands but eventually lay down flat on the ground with his hands out to his sides (Tr. at 17, 36, 77, 81).

    6.    Officer Hendershot went up onto the porch and put handcuffs on defendant (Tr. at 17). Officer Keil followed Officer Hendershot up onto the porch (Tr. at 19). Officer Hendershot rolled defendant onto his side because it is easier for people to breathe in that

4

position (Tr. at 20). Defendant was lying on the porch over the garage door facing the porch railing (Tr. at 21).

      7.     Other officers arrived and conducted a security sweep of the residence (Tr. at 20, 37). Officer Crump stood on the porch during the sweep to make sure defendant didn't try to get up and run, and he was dealing with other family members who had come to the door (Tr. at 60, 94). After the security sweep, Officer Hendershot stood defendant up (Tr. at 20-21, 37). He was standing on defendant's right side and looked down in order to begin a frisk for weapons (Tr. at 21). He observed a clear plastic bag with a beige rock-like substance in plaintiff's right front pocket (Tr. at 21, 39). The bag was not sticking out of defendant's pocket; rather, the pocket was hanging open and Officer Hendershot could see into it (Tr. at 39). Because of the large quantity of the substance, Officer Hendershot asked Officers Keil and Crump to take a look at what Officer Hendershot saw (Tr. at 21). The substance appeared to be about as big as a tennis ball (Tr. at 22). Officers Keil and Crump looked at the plastic bag while it was still in defendant's pocket and agreed that it appeared to be a large quantity of illegal drugs (Tr. at 22). Officer Crump described the drugs as racquetball or baseball sized (Tr. at 61).

      8.     Officer Hendershot removed the bag from defendant's pants pocket (Tr. at 23, 61). He conducted a frisk for weapons while the substance was field tested (Tr. at 24). Once it tested positive for crack cocaine, Officer Hendershot conducted a search of defendant's person before handing him over to detectives (Tr. at 24). Nothing further was found during that search (Tr. at 24).

      9.     Defendant Muhammad Rollie testified during the hearing. I find that nothing in the defendant's testimony materially contradicts the testimony given by the officers. Defendant testified that he was wearing the same shorts the day of his arrest that he was wearing during

5

Case 4:10-cr-00320-DGK   Document 396   Filed 01/16/12   Page 5 of 10

the hearing, and he had on a similar T-shirt; and when he stood up his T-shirt covered his shorts pocket (Tr. at 105). Defendant testified that he was standing behind the screen door, the screen went to his waist, but someone on the other side of the door would be able to see his hands (Tr. at 108-109). This statement does not seem to make much sense since one's hands are naturally below one's waist; however, this point is not particularly material. Defendant said that he put his hands up when the officer first told him to; but that he then asked what was going on and the officers continued to order him to put his hands in the air (Tr. at 109). "So, I don't know if he seen my hands up or not" (Tr. at 109). "I don't think he seen my hands in the air because of the distance, maybe because he had sunglasses on." (Tr. at 120).

10. Defendant said that he did not use curse words (Tr. at 112). He testified that he was frisked before the officer went into defendant's pocket to find the drugs (Tr. at 115-116, 118). He then testified that, "[T]hey didn't see it. I mean, if they paid attention, they could have. But the point was, I was frisked first." (Tr. at 119).

### III. DISCOVERY OF THE DRUGS

To make an investigative stop, officers must have reasonable suspicion that criminal activity is afoot, and the reasonable suspicion must be based upon specific and articulable facts which taken together with rational inferences from those facts reasonably warrant the intrusion. Terry v. Ohio, 392 U.S. 1, 25-30 (1968). The existence of reasonable suspicion is determined from the totality of the circumstances in light of the officers' experience and collective knowledge. United States v. Sokolow, 490 U.S. 1, 7-10 (1989); United States v. Cortez, 449 U.S. 411, 418 (1981).

The principal components of a determination of reasonable suspicion will be the events which occurred leading up to the stop, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable

6

suspicion.  Ornelas v. United States, 517 U.S. 690, 696 (1996).  "A police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference. Id. at 699.  Therefore, the facts must be viewed in light of the officers' experience and familiarity with drug trafficking and other criminal activity.  United States v. Johnson, 64 F.3d 1120, 1124 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996); United States v. Condelee, 915 F.2d 1206, 1209 (8th Cir. 1990).  "Even innocent actions may give rise to reasonable suspicion of they warrant consideration under the totality of the circumstances." United States v. Johnson, 64 F.3d at 1124.

In this case, the officers knew that co-defendant Ceruti was the subject of a drug investigation and that detectives had directed the officers to stop Ceruti who was driving the blue Durango.  Ceruti went to a residence where defendant was located; and while officers were attempting to take Ceruti into custody, defendant appeared behind a half-screen door.  Whether defendant raised his hands at the officers' direction or not is immaterial -- it is undisputed that the officers did not see defendant's hands up and defendant admitted that they may not have been able to see his hands.  Officers had reasonable suspicion to detain defendant while they attempted to secure the situation.  Officers may take such steps as are reasonably necessary to protect their safety and to maintain the status quo during the course of a stop.  United States v. Hensley, 469 U.S. 221, 235 (1985); United States v. Newell, 596 F.3d 876, 879 (8th Cir. ), cert. denied, 131 S. Ct. 147 (2010).  The Supreme Court has long allowed de minimum intrusions on the liberty of a person detained by a Terry stop to advance officer safety, such as a frisk for weapons.  Terry v. Ohio, 392 U.S. at 27.

Although officers conducting Terry stops must use "the least intrusive means . . . that are reasonably necessary," they may take measures "reasonably necessary to protect their

7

Case 4:10-cr-00320-DGK   Document 396   Filed 01/16/12   Page 7 of 10

personal safety." United States v. Newell, 596 F.3d 876, 879 (8th Cir.), cert. denied, 131 S. Ct. 147 (2010). In Newell, the Eighth Circuit held that a Terry stop's scope was not exceeded when two officers had handcuffed a suspect after noticing a bag of cocaine protruding from his pocket. Id. at 880. Likewise, in United States v. Navarrete-Barron, 192 F.3d 786, 791 (8th Cir. 1999), officers did not exceed the scope of a Terry stop by handcuffing suspects while they searched their truck, which the officers believed was involved in drug trafficking. The handcuffing was a "reasonable precaution" in light of the dangerous nature of the suspected crime. Id. Drug trafficking is often accompanied by dangerous weapons. Newell, 596 F.3d at 880; Navarrete-Barron, 192 F.3d at 791. Where an officer has good reason to suspect someone is trafficking drugs, he may reasonably protect the evidence and the safety of those in the area by handcuffing the suspect. United States v. Correa, 641 F.3d 961, 967 (8th Cir. 2011).

If, while conducting a valid search under Terry officers discover drugs instead of a weapon, the Fourth Amendment does not require the drug-related evidence to be suppressed. United States v. Peoples, 925 F.2d 1082, 1087, cert. denied, 502 U.S. 938 (1991) (citing Michigan v. Long, 463 U.S. 1032, 1050 (1983)). See also United States v. Stachowiak, 521 F.3d 852, 855 (8th Cir. 2008).

In this case, the officers observed the drugs in defendant's pocket when they stood him up to be frisked. The mere fact that defendant's shirt covered his pocket while he was in court does not mitigate the testimony of the officers who said they could see into defendant's pocket. Defendant had been lying on the ground, handcuffed with his hands behind his back, rolled over, and then stood up -- events that had not occurred at the time he modeled his attire in the courtroom. In any event, defendant admitted the officers would have been able to see the drugs in his pocket. Even had the officers not seen the drugs before the frisk, they were

8

entitled to frisk him for weapons and clearly would have observed the drugs at that time. Drugs discovered during a Terry pat-down search do not need to be suppressed.

Once the drugs were discovered in defendant's pocket, police had probable cause to arrest him. In United States v. Newell, 596 F.3d 876, 880 (8th Cir.), cert. denied, 131 S. Ct. 147 (2010), officers removed Newell from the car and saw a bag of cocaine hanging out of Newell's pocket. The court held that seeing evidence of a crime provided probable cause to arrest Newell. See also United States v. Sherrill, 27 F.3d 344, 347 (8th Cir. 1994) ("Probable cause to make a warrantless arrest exists when police officers have trustworthy information that would lead a prudent person to believe that the suspect has committed a crime."); United States v. Pennington, 287 F.3d 739, 747 (8th Cir. 2002) (plain view of drug activity provides probable cause to arrest).

Therefore, because officers were justified in (1) detaining defendant until the situation was secured, (2) handcuffing defendant to maintain the status quo, and (3) frisking defendant for weapons, the discovery and seizure of the drugs in his pocket were lawful. Once the drugs were discovered, police had probable cause to arrest him.

## VI. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in section III, I conclude that defendant's constitutional rights were not violated during his contact with law enforcement on June 1, 2010. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 13, 2012